**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| v. | : | **CRIMINAL NO. 22-CR-96 (CKK)** |
| | : | |
| **JOAN BELL,** | : | |
| | : | |
| Defendant. | : | |

GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, hereby, submits this memorandum in support of its sentencing recommendation for Defendant Joan Bell ("Bell").

I.    **Introduction**

Bell is an active anti-abortion extremist, who has a long history of participating in reproductive health clinic invasions around the country to prevent patients from obtaining, and providers from providing, pregnancy termination services.  She traveled from New Jersey to Washington, D.C. with one goal: prevent women from accessing reproductive health care.  To accomplish that goal, on October 22, 2020, Bell and her co-defendants invaded the Washington Surgi-clinic ("Surgi-clinic" or "clinic") and used force and physical obstructions to interfere with access to the clinic.  During this blockade, Bell used chains and bicycle locks to bind herself to several co-defendants, and she refused to remove the lock, which she wore around her neck, to delay her arrest and removal from the clinic.   Bell went limp after the lock was removed to prolong the group's efforts to obstruct clinic access.   Bell was convicted by a jury of civil rights conspiracy and Freedom of Access to Clinic Entrances (FACE) Act offenses for her role in planning and

1

executing the clinic blockade.

To address the gravity of her federal offenses and further the goals of the criminal justice system, the government recommends that the Court sentence Bell to term of incarceration at the high end of Bell's recommended Sentencing Guidelines range, which is 33-41 months at a combined adjusted offense level 20 and criminal history category I.

## II.    Procedural Posture

On October 14, 2022, the grand jury returned a two-count superseding indictment, charging Bell and her co-defendants with violating 18 U.S.C. § 241 (conspiracy against rights) and 18 U.S.C. § 248(a)(1) (FACE Act).    ECF No. 113.    These charges stemmed from Bell's participation in a scheme to obstruct access to the Surgi-clinic - a women's reproductive health clinic - located in the District of Columbia, and her participation in the blockade of that facility on October 22, 2020.    After a jury trial, on September 15, 2023, Bell was found guilty of both charges.    *See* Minute Entry, Sept. 15, 2023.    The jury also determined that Bell had violated the FACE Act by both force and physical obstruction.    *Id*.

## III.   Overview of the Crimes

During trial, the government presented the testimony of several witnesses and admitted approximately sixty exhibits into evidence. This evidence proved that the co-defendants collectively invaded the Washington Surgi-clinic ("Surgi-clinic" or "clinic") to block, for as long as possible, access to reproductive health care, and in doing so, injured one of the clinic's nurses and inflicted significant trauma on patients.

The evidence proved that the clinic blockade was planned and organized by individuals local to Washington, D.C., including co-defendants Lauren Handy ("Handy") and Jonathan Darnel

("Darnel").   Handy and Darnel advertised a call-to-action on social media, and invited participants to join the planned blockade.   *See, e.g.*, Exhibit Nos. 5066, 5082-83. Their co-defendants, along with other unindicted co-conspirators, traveled from out-of-state to participate in the October 22, 2020, Surgi-clinic blockade.

The co-defendants communicated about the planned blockade between October 7, 2020, and October 22, 2020, using social media, text messaging, phone calls, and in-person meetings. *See, e.g.*, Exhibit Nos. 3005, 4001A, 5066, 5070, 5072, 5083, 5091, 7361, 7362; 10/25/23 Trial Tr. at 158:5-12,159:3-163:2. The co-defendants communicated that the purpose of the planned Surgi-clinic blockade was to stop the clinic from providing, and patients from obtaining, reproductive health services.   *Id.*   In planning the blockade, Handy also scheduled a fake patient appointment at the clinic for October 22, 2020, under the name "Hazel Jenkins," to gain access to the clinic facility.   *See, e.g.*, Exhibit No. 5053; 10/23/23 Trial Tr. at 83:6-11.

Handy also made lodging arrangements for the blockade participants who traveled to Washington, D.C. from other states, including co-defendants: Jay Smith ("Smith"), John Hinshaw ("Hinshaw"), and William Goodman ("Goodman") from New York; Heather Idoni ("Idoni") from Michigan; Bell from New Jersey; and Paula "Paulette" Harlow ("Harlow") and Jean Marshall ("Marshall") from Massachusetts.   *See, e.g.*, Exhibit Nos. 4001A, 5002, 5091.   Additionally, Handy procured monetary donations to pay for an Airbnb lodging reservation at 133 Quincy Place NE, Washington D.C. that she made for herself and co-defendant Herb Geraghty ("Geraghty") who traveled to Washington, D.C. from Pennsylvania on October 21, 2020, to participate in the Surgi-clinic blockade.   *See, e.g.*, Exhibit Nos. 4001A, 5001, 5002, 5021, 5091.

The night before the planned clinic blockade, the ten co-defendants – led by Handy and

3

Darnel – discussed the plan for and execution of the blockade.   *See, e.g.*, 10/24/23 Trial Tr. at 22:11-23:24.   At the meeting, Handy and Darnel further discussed the Surgi-clinic's layout and floor plan so that each blockade participant knew which clinic doors to blockade.   *Id.*, at 25:21-24.   The group further discussed using locks and chains to block the Surgi-clinic doors, and the consequences of participating in the blockade, which included being arrested by the police and charged with criminal offenses.   *Id.*, at 25:21-24, 28:25-29:25.

On October 22, 2020, the group met again outside a coffee shop near the clinic to have one last discussion as to the planned blockade.   *See e.g.*, 10/25/23 Trial Tr. at 107:1-5 (suggesting meeting place was outside a "coffee house" or "restaurant"); *see also* Exhibit Nos. 2015, 2017. Bell brought to this final meetup a bag containing the chains, locks, and ropes.   *Id.*, at 27:23-24. After additional discussion, the group departed for the clinic to begin successfully obstructing the clinic's operations.   *See, e.g.*, 10/24/23 Trial Tr. at 63:18-21.

The co-defendants and other unindicted co-conspirators arrived at the Surgi-clinic shortly before it was scheduled to open the morning of October 22, 2020.   While several co-defendants hid in the Surgi-clinic's fourth floor building stairwell, Handy and Bell waited outside of the clinic's patient entrance.   *See, e.g.*, 10/25/23 Trial Tr. at 122:6-11; Exhibit No. 1079A.   Handy approached "Sasha Proctor," a medical specialist working at the clinic, in the hallway outside of the clinic and falsely represented herself as "Hazel Jenkins" and stated that she had a medical appointment.   Moments later, Bell's co-defendants who hid in the building's stairwell approached the Surgi-clinic's patient entrance.   *See, e.g.*, Exhibit Nos. 1008, 1079A.

Goodman carried the bag of chains, locks, and ropes from the stairwell and placed it on the floor just outside of the Surgi-clinic's patient entrance.   *Id.*   Bell retrieved a bicycle lock from

that bag and forcefully entered the clinic.  *Id.*  Harlow picked the bag up and forcefully entered the clinic behind Bell.  Harlow wore a bicycle lock around her neck in anticipation of using it to chain herself to Bell and other co-defendants as they blocked the Surgi-clinic's doors.  *See, e.g.*, Exhibit Nos. 1016, 1079A.

Moments before the Surgi-clinic was scheduled to open at 9:00 a.m., as the co-defendants gathered outside of the Surgi-clinic's patient entrance, Darnel – who was outside of the clinic's building - announced an imminent reproductive health clinic blockade on social media and prepared to livestream the event.  *See, e.g.*, Exhibit Nos. 1017-20, 1022-1024, 1026.  Darnel used one of his Facebook accounts to create an event he titled, "No one dies today," and captioned it, "Starting soon!  Tune in!"  *See, e.g.*, Exhibit No. 3001.

At approximately 9:00 a.m., Ms. Proctor unlocked the door to admit the waiting patients with scheduled appointments.  At that time, the co-defendants (with the exception of Darnel who was outside of the building livestreaming the event) forcefully entered through the Surgi-clinic's entrance.  *See, e.g.*, Exhibit Nos. 1008, 1079A.  Co-defendant Smith, who stood at the door when it was unlocked, forcefully pushed the door open as Ms. Proctor attempted to close the door to prevent the co-defendants from entering.  *Id.*  The co-defendants collectively pushed and shoved their way in and against the clinic staff who attempted to keep the co-defendants from entering.  *Id.*

As co-defendant Smith forced his way into the clinic, he pushed clinic nurse "Sara Compton" causing her to sprain her ankle and suffer bodily injury.  *See e.g.*, Exhibit No. 1001; 10/23/23 Trial. Tr. at 45:23-25. Co-defendants Marshall and Geraghty pushed and shoved against Ms. Proctor.  And, as Harlow intentionally pushed her way into the clinic, she caused "Tina

Smith," the clinic's administrator, to fall backwards and into a chair.   *See, e.g.*, Exhibit No. 1008.

After forcing their way into the clinic's waiting room, the co-defendants set about physically blockading the Surgi-clinic doors.   *See e.g.*, Exhibit No. 1001.   Handy directed the blockaders on what to do.   *Id.*   Hinshaw and Marshall moved chairs in the Surgi-clinic's waiting room to block doors that led to the clinic's treatment areas.   *Id.*   Harlow, who entered the clinic with the bag of locks, chains, and rope, worked with Smith, Hinshaw, and Bell to intentionally bind themselves together using the chains, ropes and bicycle locks, and they sat in chairs against the Surgi-clinic's interior doors.   *Id.*   Marshall assisted Harlow, Smith, Hinshaw, and Bell with using the locks and chains to bind themselves together.   *Id.*   Goodman and Idoni went into the hallway outside of the Surgi-clinic and stood in front of another clinic doorway that was used as an employee entrance.   *See, e.g.*, Exhibit Nos. 1008, 1016, 1020, 1079B.

During the blockade, "Ashley Jones," a patient at the clinic, was unable to access the treatment area because co-defendants Bell, Harlow, Smith, Hinshaw, and Marshall blocked the clinic's doors.   *See, e.g.*, Exhibit Nos. 1008, 1016.   Ms. Jones was forced to climb onto a chair and through a receptionist window in the waiting room to access the Surgi-clinic's treatment area, which was where the clinic staff remained during the co-defendants' blockade.   *Id.*

A second patient, "Shampy Holler," was also unable to access the clinic's treatment area because of the co-defendants' blockade.   *See, e.g.*, 9/12/23 Trial. Tr. at 14:22-25.   Mrs. Holler, who was experiencing labor pains and in need of immediate medical attention, was forced to lay on the hallway floor outside of the clinic because the co-defendants refused to allow her and her husband to enter.   *Id.*, at 15:1-2.   At one point as Mrs. Holler lay on the ground, she was accosted by Marshall.   *See, e.g.*, Exhibit No. 1079B.   As Mrs. Holler attempted to get up from the floor,

Marshall pushed Mrs. Holler back down to the floor in order to prevent her from entering into the facility.  *Id.*; *see also* 9/12/23 Trial. Tr. at 21:7-9.   After a short time, the clinic staff managed to open the staff entrance briefly and were able to get Mrs. Holler into the clinic.  *Id.*, at 21:16-19.

Throughout the entire blockade, Darnel livestreamed the event on social media.  *See, e.g.*, Exhibit Nos. 1017-1019, 1022-1024, 1026.   Additionally, he assisted his co-defendants in prolonging the blockade by secreting the keys to the bicycle locks used to bind several blockading co-defendants together to an unindicted co-conspirator who was outside of the clinic building. *See* Exhibit No. 1024.   Darnel did this in order to delay the blockading co-defendants' inevitable arrests by responding Metropolitan Police Department ("MPD") officers.

The co-defendants remained within the Surgi-Clinic's waiting room for several hours blocking the doors in an effort to interfere with the provision of abortion services.   They refused to move or leave the clinic when asked by the clinic's staff and responding police officers.  *See, e.g.*, Exhibit No. 1016.   The co-defendants were very vocal about their blockade, and their reasons for preventing access to the Surgi-clinic.   For example, Handy explained to the first responding MPD officers, "[the co-defendants] were doing a rescue . . . . On the fourth floor is an abortion facility and so today [the co-defendants] are blocking it . . . to not allow people to go inside . . . . [t]o stop abortions today."  *See* Exhibit No. 1009.   Similarly, while sitting in a chair blocking access to the clinic's treatment area, Harlow explained to one MPD officer, "We can't move. We have permanent locks."  *Id*.   Harlow then further lectured that same officer, telling him that he "ha[s] a conscience" that should lead him to "let [the co-conspirators] stay" in the clinic to "save lives."  *See* Exhibit No. 1137.

After refusing the requests to move or leave the Surgi-clinic, the co-defendants were

advised that they would be arrested.   With the exception of Darnel and Geraghty – who left the clinic moments before arrests were made, the remaining co-defendants were arrested.   They passively resisted arrest by going limp, including when the police cut the bicycle locks that Bell and Harlow wore around their necks and placed them under arrest.   *See, e.g.*, Exhibit No. 1016. The arrested co-defendants were carried out of the building and into transport vehicles.

In short, the testimony and exhibits presented proved that the co-defendants refused to move or leave the clinic because it was their intention to interfere with the Surgi-clinic's patients from obtaining, and the clinic staff from providing, pregnancy termination services.   The co-defendants' participation in the planned blockade interfered with Ms. Jones, Mrs. Holler, and other patients from accessing the Surgi-clinic, and further interfered with the clinic staff's ability to provide reproductive health services.

## IV.   Bell's Criminal Conduct

The evidence at trial proved that Bell was an active participant in the conspiracy and blockade.   In the weeks leading up to the blockade, Bell was actively involved in the conversations and meetings where the conspirators agreed to blockade the Surgi-clinic and recruit others to join them.   Evidence at trial showed that between October 7, 2020, and October 22, 2020, Bell and Handy exchanged 22 mobile phone calls and one text message.   USA Ex. No. 7362.   Through Handy's social media messages with other co-conspirators, it was clear that Bell had agreed to, and did in fact, agree to participate in the Surgi-clinic blockade.[1]   *See, e.g.*, ECF

---

[1] Rule 404(b) evidence admitted at trial further established that Bell, Handy, and Darnel blockaded a reproductive health clinic in Alexandria, Virginia, on November 16, 2021; and that Bell and Goodman blocked access to a reproductive health clinic in Shrewsbury, New Jersey, on October 14, 2020.

No. 474, Memorandum Opinion, at 3.

Bell's involvement in the conspiracy was significant. She is an iconic figure among extreme anti-abortionists, having participated in countless clinic invasions over the prior three decades. Bell was known among her co-conspirators to engage in "lock-and-block" rescues, having written books about conduct that co-defendant Idoni read in advance of the blockade in D.C. Handy's communication evidence further revealed that Bell recruited participants and provided Handy with guidance as she planned the crime. *See, e.g.*, USA Ex. Nos. 4001A, 5083 at 23; *see also* ECF No. 474 at 3. Bell then traveled from New Jersey to D.C. the day before the planned blockade and participated in a pre-invasion meeting with her co-conspirators to discuss the final plans. At that meeting, Bell discussed using props, including locks and chains, to bind blockaders together to delay their inevitable arrests and prolong the physical obstruction. The meeting ended with an agreement to have a final walk-through meeting the next morning immediately before the incursion into the clinic.

The co-conspirators met at a location near the clinic the morning of the blockade. Bell brought to this final meetup a bag containing chains, locks, and rope. *See* ECF No. 474 at 5. After a final meeting to walk-through the plan, discuss the clinic's layout, and how the blockaders would enter the facility, Handy divided the co-conspirators into groups. Each group separately walked to the clinic building. The first group, which comprised of Bell, Handy and the other blockading co-defendants, walked over to the building. While Handy and Bell were tasked with posing as a clinic patient ("Hazel Jenkins") and companion who would wait outside of the clinic's main entrance, the other blockaders hid in the building's stairwell on the fourth floor.

When the clinic door opened for the first scheduled appointments, which included Handy's

9

fake "Hazel Jenkins" appointment, the blockaders forced entry into the facility.   Bell entered the clinic with a bicycle lock in hand after helping co-defendant Harlow fasten a lock around her neck. *Id*., at 6.   Once inside of the clinic's waiting room, Handy directed the blockaders to rearrange the furniture, bind themselves together with locks and chains, and block the clinic doors.   Bell placed the bicycle lock she entered with around her neck, and worked with co-defendants Harlow and Marshall to affix metal chains to the locks Bell and Harlow wore.   Bell then moved synchronously with Harlow and sat in chairs against two clinic doors that provided access to the treatment area. The chains were then wrapped around co-defendants Hinshaw and Smith, who sat in chairs next to them, and the collective group obstructed the clinic's staff and patients from entering or exiting through the clinic's waiting room doors.   During the several hours that Bell sat and blocked the doors, she sang, chanted, prayed, and yelled her anti-choice sentiments at clinic patients and staff.

Arresting officers were forced to use power tools to cut through the locks and chains that Bell used to bind herself to her co-defendants.   Once the props were removed, Bell refused to exit the clinic.   MPD officers had to pick Bell up from the chair she sat in, place her in a wheelchair, and remove her from the facility.

## V.     Bell's False Trial Testimony

Bell was one of five Defendants who chose to testify.   Although Bell did not testify in her own defense, following her conviction, she testified as a defense witness for co-defendant Harlow at her bench trial.

Regarding the conspiracy, Bell testified that she had told Handy that Bell, co-defendant Goodman and "two [other] people" "want[ed] to risk arrest" by blockading the clinic.   ECF No. 474 at 3.   Bell along with co-defendants Harlow and Marshall drove to D.C. to participate in the

"traditional rescue." *Id*.   It was clear from her testimony that Bell discussed the blockade with Harlow and Marshall, and the three of them collectively decided to join the blockade by traveling to D.C. together, and that they would use locks and chains to block clinic access.   *Id*.

Bell's testimony concerning the blockade was "utterly belied by video evidence."   *Id*., at 8.   She stated that Harlow entered the clinic before her, and that Bell placed the bicycle lock around Harlow's neck while she was on the floor, despite clear evidence to the contrary.   *Id*.   Bell claimed that their purpose was to counsel women against abortion, and not to prevent them from accessing the clinic.   This was contradicted by video evidence of her co-defendants' statements that clearly indicated their intent was to stop abortions that day.   Although Bell agreed that the group used locks and chains to delay their arrest, her claimed purpose to buy time for the "sidewalk counselors" to plead with clinic patients against abortion was flatly rejected by this Court.   This Court found that Bell "lied on the stand," and that her "self-serving testimony" was incredible. *Id*.

## VI.   Statutory Penalties

The two counts, for which Bell and her co-defendants were convicted, carry the following statutory penalties:

Count 1:   Conspiracy against Rights, in violation of 18 U.S.C. § 241, carries a maximum sentence of 10 years' incarceration;

Count 2:   Clinic Access Obstruction, in violation of 18 U.S.C. § 248(a)(1) & (b), carries a maximum sentence of 12 month's incarceration.

## VII.   Sentencing Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."   *United States v. Gall*, 552 U.S. 38, 45

(2007); *Rosales-Mireles v. United States*, 585 U.S. 129, 133 (2018) ("[D]istrict courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process.") (internal quotations and citations omitted).   "[T]he Guidelines remain the foundation of federal sentencing decisions.   *Hughes v. United States*, 584 U.S. 675, 685 (2018).   "As a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence.   *Id.* at 49. The Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions."   *Id.* at 46.

The government agrees with the Sentencing Guidelines calculation set forth in the Presentence Investigation Report ("PSR").   ECF No. 516.   Bell's Base Offense Level for both counts of conviction is 12.   PSR at 13, ¶ 76.   And, her Base Offense Level is adjusted as follows:

| Guideline | Description | Adjustments |
|---|---|---|
| § 2H1.1(a)(2) | Where the offense involved two or more participants | 12 |
| § 3A1.1(b)(1) | Vulnerable victim[2] | 2 |
| § 3A1.3 | Restraint of victim[3] | 2 |
| § 3C1.1 | Obstructing or impeding the administration of justice[4] | 2 |
| § 3D1.4 | Combined offense level for two equally serious groups | 2 |
| **Combined** | | **20** |

[2] This adjustment is applicable because Ms. Jones and Mrs. Holler were pregnant and unusually vulnerable due to their physical condition.   *See, e.g.*, *United States v. James*, 139 F.3d 709, 714-15 (9th Cir. 1998) (Affirming the trial court's application of the vulnerable victim adjustment where the defendant threatened a pregnant bank teller during the commission of a bank robbery).

[3] "Physically restrained" means the forcible restraint of the victim *such as* being tied, bound, or locked up.   U.S.S.G. §1B1.1 (Application note 1(K)) (emphasis added).   The use in the definition of "such as" indicates that the terms are merely illustrative examples and do not limit the type of conduct that may constitute a physical restraint.   *Arcoren v. United States*, 929 F.2d 1235, 1246 (8th Cir. 1991) (Restraint of victim adjustment applied in case where the victims were pushed into a room and prevented from leaving); *see also United States v. Stokley*, 881 F.2d 114, 116 (4th Cir. 1989) (same).

[4] This upward adjustment is appropriate because Bell committed perjury at trial.

| Adjusted Offense Level | | |
|---|---|---|

*See Id.*, at 14-15, ⁋⁋ 78-96.   Based upon Bell's criminal history as reflected in the PSR, Bell should be sentenced under **Criminal History Category I**.   *See Id.*, at 23, ⁋ 114.   Accordingly, Bell's Guidelines sentencing range is 33-41 months.

## VIII.   Section 3553(a) Sentencing Factors

The Court should next consider the sentencing factors set forth in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 49-50.   That Section provides that Court consider the following:   (A) "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1); (B) "the history and characteristics of the defendant," *id.*; (C) promotion of "respect for the law," 18 U.S.C. § 3553(a)(2)(A); (D) general and specific "deterrence," 18 U.S.C. ' 3553(a)(2)(B)(C); (E) the Guidelines and Guideline range, § 3553(a)(4); and (F) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6).

### A.     Nature and Circumstances of the Offenses

The first factor this Court should consider is the nature and circumstances of the offense. Bell helped plan and organize the blockade, which included recruiting participants, discussing tactics, and advising the group's leader – Handy.   Bell's participation in the blockade was also significant, where she used props to blockade a reproductive health care facility.   The blockade involved numerous participants with the goal to prevent patients from obtaining, and providers from providing, abortion services.

Among other things, Bell used her mobile phone to communicate with her co-conspirators, including Handy, Harlow, and Marshall.   Bell recruited Harlow and Marshall from Massachusetts

13

to join Bell in D.C. to block clinic access.   Having an extensive history of active engagement in extreme conduct targeting abortion clinics, Bell knew that the purpose of the Surgi-clinic blockade was to prevent the provision of pregnancy termination services.   Bell brought a bag of locks and chains to the blockade and volunteered to bind herself to others while blocking clinic doors with her body.   Bell knew about Handy's fake appointment to ensure that she and her co-defendants could enter the facility, and in fact posed as Handy's companion when they arrived at the clinic for the fake appointment.   Bell also knew that she would be arrested for blocking access and refusing to leave the clinic.   Her goal was to prolong the blockade, and she used locks and chains to delay her inevitable arrest.   Upon forcing entry into the clinic with her co-defendants, Bell worked with Harlow and Marshall to distribute locks and chains.   The three co-defendants tied the chains to the bicycle locks that Bell and Harlow wore, and then passed the chain to others. Within minutes of the forced entry, Bell and Harlow connected their chains to co-defendants Smith and Hinshaw, and the four of them sat in a row of chairs blocking the clinic's doors that led to the medical procedure area.   At the end of the blockade, Bell went limp and refused to leave the clinic once arresting officers released Bell from her chains.   This forced arresting officers to physically place Bell in a wheelchair to remove her from the facility.

A prison sentence at the high end of the Guidelines range would account for Bell's serious offenses.   Her strongly held anti-abortion beliefs led her to travel to D.C. to participate in an organized clinic blockade.   The blockade, which was broadcast to an on-line audience, encouraged others to commit similar crimes, publicized Bell's own offense, and traumatized the victims.   The blockade will have lasting impacts on the clinic's patients, including, Ms. Jones, Mrs. Holler, and the clinic staff, which they will likely struggle with life-long.   Ms. Jones was

forced to climb through a window to receive her care and Mrs. Holler collapsed in pain, while being blocked from accessing the clinic.   Both Ms. Jones and Mrs. Holler had already begun their procedures, so denying them access to the clinic was especially egregious.

B.      The History and Characteristics of the Defendant

Bell's history and characteristics support the imposition of a sentence at the top end of the applicable Guidelines.   Bell's personal history of participating in clinic invasions over the previous three decades, as demonstrated by her criminal history noted in the presentence investigation report, further warrants imposition of a Guidelines sentence.   That criminal history includes approximately 81 arrests, nearly all of which were related to her anti-abortion activism.

In at least two other incidents that this Court learned about through admission of Rule 404(b) evidence, Bell and some of her co-defendants similarly blockaded reproductive health clinics prior to and following the incident in D.C.    First, Bell and co-defendant Goodman were arrested for blocking access to a New Jersey abortion clinic on October 14, 2020, just eight days before the Surgi-clinic blockade.   Then, on November 16, 2021, Bell, Handy, Darnel, and others were arrested for blockading an Alexandria, Virgina, abortion clinic on November 16, 2021, approximately one year after the blockade in D.C.

Accordingly, a high-end Guidelines prison sentence would appropriately address Bell's significant history of obstructing access and personal characteristics of using locks and chains in some cases to further her criminal objectives.

C.      Promotion of Respect for the Law

Considering the gravity of the offenses, a significant sentence in this matter is necessary to reflect the seriousness of the offense and promote respect for the law.   *See Gall*, 552 U.S. at 54

(recognizing that "a lenient sentence for a serious offense threatens to promote disrespect for the law").   A high-end Guidelines prison sentence is appropriate in this case because Bell was part of a large group that planned and blocked access to a reproductive health clinic in D.C.   Bell planned with others to "injure, oppress, threaten, and intimidate" the clinic's patients and providers from exercising their reproductive health rights free from violence and obstruction.   *See* Superseding Indictment, ECF No. 113.   As established at trial, Bell understood that she had agreed with her co-conspirators to commit a crime, and that it was a violation of the FACE Act.   She and her co-defendants were prepared to be arrested knowing the consequences of their actions.   Bell's clinic blockade involved the use of force, which resulted in clinic staff member suffering bodily injury and prevented Mrs. Holler, who was suffering labor pains, from getting up off the floor and entering the clinic.   The physical obstruction was especially traumatic for the clinic patients who testified at trial, which was apparent during the offense and their emotional trial testimony.   *See*, *e.g.*, USA Ex. No. 1011.

The D.C. blockade occurred eight days after Bell and Goodman similarly blocked access to a clinic in New Jersey, and approximately one year before Bell struck again and blocked access to a Virgina clinic with Handy and Darnel.   Given Bell's participation in three blockades over the course of one year, and her significant arrest history related to her anti-abortion activism, Bell had demonstrated a clear disrespect for the law.

A high-end Guidelines prison sentence would also promote respect for the law.   Over the course of approximately 30 years, Bell faced clear choices with regards to her activism: to engage in criminal conduct or engage in lawful protest.   Bell has always chosen the former.   In the instant case, she and her co-defendants used force to take control of the Surgi-clinic and obstruct access

to the facility.   The trial evidence proved that Bell appreciated the criminality of her conduct in committing a crime by blockading the clinic, and that despite knowing the consequences of her actions, she chose to violate federal laws.   All of Bell's choices point to the obvious need for a high-end Guidelines prison sentence that will promote respect for the law.

  D. *General and Specific Deterrence*

  Imposition of a significant sentence is necessary to provide for both general and specific deterrence.   "Under the theory of general deterrence, the government essentially seeks to make an example of an offender through punishing him so that other potential offenders are intimidated into refraining from committing the contemplated crime."   *United States v. Slatten*, 865 F.3d 767, 819 (D.C. Cir. 2017) (noting that "harsh sentences" "generally operate as strong deterrents"); *United States v. Diaz-Navarro*, 567 F. App'x 256, 257 (5th Cir. 2014) (since defendant had committed offense before and received a light sentence a "'long incarceration period'" was necessary for deterrence);   *United States v. Rivera*, 488 F. App'x 225, 227 (9th Cir. 2012) (harsh sentence necessary for deterrence in light of defendant's recidivism).

  First, a significant sentence is necessary "to afford adequate deterrence to criminal conduct" by others.   18 U.S.C. 3553(a)(2)(B).   Sentencing Bell to a period of incarceration would deter other abortion extremists (whether pro-life or pro-choice) from obstructing access to reproductive health services.   The general deterrent effect would be significant because Bell is well-known and celebrated by anti-abortion extremists, and a high-end Guidelines prison sentence would broadcast a strong message to other would-be criminal actors.

Second, a significant sentence is also necessary for specific deterrence.   In light of Bell's strongly held beliefs, and history of participating in clinic invasions, a prison sentence particularly at her current age, will prevent her from engaging in future violations of federal law.

Without imposition of a significant Guidelines prison sentence here, Bell and other would-be violators will not be discouraged from engaging in misconduct and may believe that there are relatively minimal consequences for flagrantly committing crimes that target the provision of reproductive health care.

E.    The Sentencing Guidelines

Examination of the Section 3553(a) factors shows that a high-end Guidelines sentence is appropriate in this case.   While a "sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply," *Rita v. United States*, 551 U.S. 338, 351(2007), and it "may not presume that the Guidelines range is reasonable," *Gall*, 552 U.S. at 50; *Nelson v. United States*, 555 U.S. 350, 350 (2009), "even in an advisory capacity the Guidelines serve as 'a meaningful benchmark' in the initial determination of a sentence and 'through the process of appellate review.'"   *Rosales-Mireles*, 585 U.S. at 133.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."   *Rita*, 551 U.S. at 349.   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"   *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to 'base its

18

determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108.   As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. § 1A1.1, intro, comment 3.   More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process.   *See* 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines).   Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case.   Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005).

In light of Bell's conduct in this case, her other recent blockade activity in New Jersey and Virginia, and her significant arrest history connected to her strongly held beliefs, a high-end Guidelines prison sentence would be reasonable and appropriate for both counts of conviction.   A Guidelines sentence in this case would be 31 to 41 months – a significantly lesser amount of time than the maximum allowable sentence for her counts of conviction (Count One statutory maximum sentence of 10 years; Count Two statutory maximum sentence of 12 months).   Such a sentence would be reasonable because it accounts for her conduct in D.C., as well as her conduct in other clinic blockades in New Jersey and Virginia.   And, it would be sufficient, but not greater than necessary, to comply with the basic aims of Section 3553(a).   *Rita*, 551 U.S. at 348.

F.    *Unwarranted Sentencing Disparities*

The Court should impose a Guidelines sentence to avoid unwarranted sentencing disparities.   18 U.S.C. § 3553(a)(6); *see, e.g.*, *Molina-Martinez v. United States*, 578 U.S. 189,

193 (2016) ("Uniformity and proportionality in sentencing are achieved, in part, by the Guidelines'

significant role in sentencing"); *United States v. Alford*, 89 F.4th 943, 953 (D.C. Cir. 2024) ("Thus,

'[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed

to treat similar offenses and offenders similarly.'"); *United States v. Otunyo*, 63 F.4th 948, 960

(D.C. Cir. 2024) (same).

      Although Bell and her co-defendants in this case, along with defendants from one other

unrelated case from the Middle District of Tennessee (*see United States v. Gallagher*, et al., 22-

cr-327 (M.D.TN)), will be the first groups of defendants sentenced for conspiring to violate

reproductive health rights, they all are similarly situated to other Section 241 convicted defendants

who received Guidelines sentences where the objects of their civil rights conspiracy targeted other

federally protected rights. *See*, *e.g.*, *United States v. Liddy*, 542 F.2d 76, 78 (D.C. Cir. 1976)

(Defendant convicted of violating Section 241 (Fourth Amendment right at issue) sentenced to a

term of imprisonment from one to three years); *United States v. Stewart*, 65 F.3d 918, 931-32 (11th

Cir. 1995) (Court imposition of a Guidelines sentence in a Section 241 prosecution affirmed (42

U.S.C. § 3631 housing rights at issue)); *United States v. Whitney*, 229 F.3d 1296, 1309 (10th Cir.

2000) (same); *United States v. Allen*, 341 F.3d 870, 897 (9th Cir. 2003) (affirming Guidelines

sentence for Section 241 conviction with right at issue was denial of public accommodations

because of race); *United States v. McCoy*, 480 F.App'x 366, 373 (6th Cir. 2012) (Guidelines and

statutory maximum sentence imposition affirmed for convictions of Sections 241 and 242).

Therefore, a Guidelines sentence for Bell would not result in any sentencing disparities.

      The government also strongly opposes any requested variance from the Sentencing

Guidelines.   Bell's conduct showed a flagrant disregard for women's reproductive health rights,

and the lack of concern for Ms. Jones and Mrs. Holler who, for example, sought care during a particularly sensitive time in their lives.   Combined with the other sentencing factors, a high-end Guidelines prison sentence would serve all of the Section 3553(a) factors.

## IX.    Requested Sentence

The government requests this Court sentence Bell to a term of imprisonment at the top end of her applicable Sentencing Guidelines range, which is 33-41 months.   The advisory Guidelines Sentencing range should be given considerable weight.   First, the Guidelines range is itself a § 3553(a) factor.   "The fact that § 3553(a)[(4)] explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process."   *Gall*, 552 U.S. at 50, n.6. Second, one of the Sentencing Commission's purposes in promulgating the Guidelines was to "assure the meeting of the purposes of sentencing as set forth in section 3553(a)(2)."   28 U.S.C. §§ 991(b)(1)(A), 994(f).   The Commission wrote the Guidelines to "carry out these same § 3553(a) objectives," resulting in "a set of Guidelines that seek to embody the § 3553(a) considerations, both in principle and in practice." *Rita*, 551 U.S. 338, 350.   "[W]here judge and Commission both determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that ⬚significantly increases the likelihood that the sentence is a reasonable one."   *Rita*, 551 U.S. at 347.   In other words, "the Commission's recommendation of a sentencing

21

range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.[5]

Bell was a key participant in the instant offense as well as in other clinic blockades she committed in New Jersey and Virginia.  Despite a significant arrest history for participating in other clinic invasions, Bell has not been deterred from violating federal laws.  Bell not only capitalized on her victimization of vulnerable victims, she and her co-defendants promoted and publicized her crimes.  She also committed perjury and has not demonstrated any willingness to stop or encourage others to find lawful ways to advance their beliefs.  A high-end Guidelines prison sentence in the 33-41 months range will appropriately address all the Section 3553(a) factors and vindicate the rights of those whom Bell victimized.  In particular, such a sentence reflects the gravity of the offenses (to include vindicating the rights of those whom Bell victimized), the need for deterrence, and the absence of any mitigating factors.

Respectfully submitted,

KRISTEN CLARKE
ASSISTANT ATTORNEY GENERAL
CIVIL RIGHTS DIVISION
*/s/ Sanjay H. Patel*
SANJAY H. PATEL
IL Bar. No. 6272840
Trial Attorney

---

[5]     The government respectfully disagrees with Probation's recommendation for a downward variance.  ECF No. 517.  Their recommendation is based on the following: (1) the nature of the circumstances of the offense, and (2) to avoid unwarranted sentence disparities.  *Id.* at 3.  As set forth above, the government believes that the nature and circumstances of the offenses – attempting to deny the receipt of reproductive health care and intentionally inflicting physical and mental pain on patients – merits a Guidelines sentence; and, as the D.C. Circuit has held, imposing a Guidelines sentence is the best way to avoid unwarranted sentencing disparities.

Criminal Section, Civil Rights Division
Email: Sanjay.Patel@usdoj.gov

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052
*/s/ John Crabb Jr.*
JOHN CRABB JR.
NY Bar No. 2367670
REBECCA G. ROSS
NY Bar No. 5590666
Assistant United States Attorneys
601 D Street, NW
Washington, DC 20001
John.D.Crabb@usdoj.gov
Rebecca.Ross2@usdoj.gov